**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MANUEL DIKRAN SASSOUNIAN,<br><br>A Fugitive from the Government of the Republic of Lithuania. | Case No. 2:19-cv-02455-CJC-AFM<br><br>**MEMORANDUM OPINION AND ORDER GRANTING THE GOVERNMENT'S REQUEST TO CERTIFY EXTRADITION** |

## I. BACKGROUND

On April 1, 2019, the United States of America ("United States" or the "government"), acting on behalf of the Republic of Lithuania ("Lithuania"), filed a request for the extradition to Lithuania of Manuel Dikran Sassounian ("Sassounian" or "Relator") (ECF No. 19), under the extradition treaty between the United States and Lithuania ("Treaty") (ECF No. 19 at 15-24). On the same date, the matter was referred to the undersigned magistrate judge. The Court is in receipt of a formal request for extradition, including supporting documentation submitted by Lithuania. On June 10, 2019, the government filed its extradition memorandum. (ECF No. 35.) The government asserts that Relator should be extradited to Lithuania to stand trial

for (1) Forgery of a Document, in violation of Article 300(1) of the Lithuanian Criminal Code ("LCC"); (2) Swindling, in violation of Article 182(2) of the LCC; and (3) Violating Public Peace and Order, in violation of Article 284(1) of the LCC. After receiving several extensions, Relator filed his brief in opposition to the request for extradition on January 10, 2020. The government filed a reply on February 3, 2020. An extradition hearing was held on February 11, 2020, at which Relator appeared with counsel.

The Court has carefully reviewed the totality of the evidence presented and, for the reasons stated below, finds that the government has established the requirements for a certificate of extradition, including probable cause that Relator committed the charged offenses. Accordingly, the government's request for certification of extradition is granted.

## II.     STANDARD FOR OBTAINING A CERTIFICATE OF EXTRADITION

Extradition from the United States is governed by 18 U.S.C. § 3184. That statute confers jurisdiction on "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" to conduct an extradition hearing under the relevant extradition treaty and to issue a certificate of extradition to the Secretary of State. In the Central District of California, magistrate judges are authorized by general order to preside over extradition proceedings. *See* C.D. Cal. Gen. Ord. 05-07.

To obtain a certificate of extradition on behalf of a requesting state, the government has the burden of showing the following elements: (1) the court has jurisdiction to conduct the extradition proceedings; (2) the court has jurisdiction over the relator; (3) a valid extradition treaty between the requesting state and the United States is in full force and effect; (4) the relator is charged with having committed a criminal offense within the jurisdiction of the requesting state; (5) the charged offense is extraditable under the relevant extradition treaty; and (6) competent evidence establishes probable cause to believe that the person named in the extradition request

committed the charged offense.  *See* 18 U.S.C. §§ 3184, 3190; *Prasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005).  "After an extradition magistrate certifies that an individual can be extradited, it is the Secretary of State, representing the executive branch, who ultimately decides whether to surrender the fugitive to the requesting country."  *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006).

## III.  UNDISPUTED AND DISPUTED ISSUES

Based on the parties' written submissions and the statements of counsel at the hearing, the following elements for extradition are <u>undisputed</u> in this case:  The Court has jurisdiction to conduct this extradition proceeding and has personal jurisdiction over the Relator.  An extradition treaty between the United States and Lithuania is valid and is in full force and effect.  The Relator is charged with having committed criminal offenses within the jurisdiction of Lithuania.  The charged offenses of forgery and swindling are extraditable under the Treaty.

Two elements of extradition are <u>disputed</u> here:  whether the charged offense of violating public peace and order is extraditable under the Treaty and whether competent evidence establishes probable cause to believe that Relator committed the charged offenses of forgery, swindling, and violation of public peace and order. Those elements are addressed below.

## IV.  EXTRADITABILITY OF THE OFFENSE OF VIOLATING PUBLIC PEACE AND ORDER UNDER THE TREATY

Article 2 of the Treaty defines extraditable offense as one "punishable under the laws of both States by deprivation of liberty for a period of more than one year or by a more severe penalty."  Both sides agree that the charge of violation of public peace and order under Lithuanian law corresponds to a misdemeanor under California law and thus, by itself, is not an extraditable offense under the Treaty. However, Article 2, paragraph 5 of the Treaty provides that, "If extradition has been granted for an extraditable offense it shall also be granted for any other offense specified in the request . . . provided that all other requirements for extradition are

met." (ECF No. 19 at 16.) Therefore, if the Court certifies that Relator is extraditable for swindling or forgery, it may also do so for violating public peace and order, assuming all other requirements are met. This conclusion is consistent with the position taken by the government in its briefing, and it was agreed to by Relator at the hearing.

## V. ASSESSMENT OF PROBABLE CAUSE

The question of probable cause asks whether there is "evidence warranting the finding that there was a reasonable ground to believe the accused guilty." *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir. 1988). Probable cause means a "fair probability" that the suspect has committed the charged crime, *Garcia v. Cty. of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011), and the burden of demonstrating its existence rests with the government, *Barapind v. Enomoto*, 400 F.3d 744, 747 (9th Cir. 2005) (per curiam). Evidence in support of an extradition request need not be admissible at a later trial. *See, e.g., Then v. Melendez*, 92 F.3d 851, 855 (9th Cir. 1996) (noting that rules of evidence do not apply in extradition context). An extradition court may consider credibility of proffered evidence and weight to give it. *See Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986).

The evidence presented by the government on the charges of forgery and swindling is found at ECF No. 19 at 43-46 (affidavit of Lithuanian prosecutor).[1] The evidence on the charge of violation of public peace and order is found at ECF No. 19 at 55-99. The documents submitted by the government in support of the request for extradition have been properly authenticated pursuant to 18 U.S.C. § 3190. It is not disputed that Relator is the individual for whom extradition is sought by Lithuania.

### A. Swindling and Forgery

Swindling under Lithuanian law requires proof that a person "by deceit . . . acquires another's property of a high value . . . ." (ECF No. 19 at 34.) Forgery under

---

[1] The government has also submitted the results of the Lithuanian pre-trial investigation and its detention order. (ECF No. 19 at 48-49, 51-53.)

Lithuanian law requires proof that a person "produces a false document, forges a genuine document or stores, transports, forwards, uses or handles a document known to be false or a genuine document known to be forged." (ECF No. 19 at 34.) Thus, to prove this charge, Lithuania must show that Relator prepared or provided a false or forged document.

It is alleged that Relator swindled $123,030.58 from J.V. and O.V. in Lithuania. The evidence presented by the government in paragraphs 1 and 2 of the prosecutor's affidavit (ECF No. 19 at 43-44) shows that Relator encouraged J.V. and O.V. to invest in a plot of land that he said contained gold deposits. Relator told J.V. and O.V. that the investment would be part of a secret project of a company headed by his daughter, that the investment would be safe, and that it would yield a very high rate of return ("thousands of percent"). Based on Relator's representations, J.V. and O.V. decided to make the investment, mortgaged their home, took out a bank loan, and transferred the funds to Relator's bank account on October 22, 2007. The false document that Relator allegedly forged or provided is not itself included in the evidence, but a portion of it is quoted in the prosecutor's affidavit. (ECF No. 19 at 44.) The document is dated October 24, 2007 and, on its face, is stated to be from "B.E. Investment Group" in California.

According to paragraph 5 of the prosecutor's affidavit, the bank records of J.V. show that he made an international funds transfer in the amount of $123,030.58 to Relator's Wells Fargo Bank account on October 22, 2007. For over two years thereafter, Relator did not deliver confirming documents to J.V. and O.V.; instead, Relator told J.V. and O.V. their investment was safe, profits were growing, and they had nothing to worry about. On March 9, 2010, J.V. visited Relator at his home in Lithuania, and Relator provided him with the document from "B.E. Investment Group" of "California USA" dated October 24, 2007. This document referred to the approximate amount invested by J.V. and stated that Relator was also allocating $152,000 of his funds to complete J.V.'s investment. The document included a

handwritten note dated August 6, 2008 from Relator to his daughter (Charlotte), which – consistent with his prior representation that his daughter headed the investment firm − asked if she "could please take care of this," *i.e.* the reallocation of shares.

Paragraphs 6 and 7 of the prosecutor's affidavit (ECF No. 19 at 45) state that based on information provided by the U.S. Department of Justice, Office of International Affairs and by Interpol, a business search was conducted for "B.E. Investment Group," and no company was found with that name. In addition, no company named "B.E. Investment Group" was registered to do business in California at the address listed on the document provided to J.V. by Relator. While companies named "B.E. Overseas Investment Group LLC" and "B&E Investments LLC" were identified, neither was reported to have any relation with Relator or his family, and the latter company was closed in 2004.

According to paragraph 3 of the prosecutor's affidavit, Relator's friend E.V. obtained a copy of the B.E. Investment Group document from a facsimile machine in a house she shared with him in Lithuania. E.V. also determined that Relator's daughter was not the head of a firm but was employed in a school.

Paragraph 10 of the prosecutor's affidavit (ECF No. 19 at 46) provides that Relator was interviewed at his home in California. During that interview, Relator admitted to knowing J.V., but stated that he did not receive any money from J.V. and "the story that J.V. had given him money was made up."

Based on the evidence in the prosecutor's affidavit, there are reasonable grounds to believe that Relator used deceit to convince J.V. and O.V. to send him substantial funds in October 2007. Relator falsely stated that he would "invest" their money in land with gold reserves through a firm headed by his daughter – even though the investment firm did not exist and his daughter worked as a school teacher, not the head of a firm. J.V.'s repeated requests for written confirmation of the investment were then avoided, until Relator created a false receipt from the sham

"B.E. Investment Group" and provided it to J.V. in March 2010. Relator also added a handwritten note to the receipt asking his daughter (apparently as purported head of the fake firm) to move shares within the company to complete J.V.'s investment. Later, during a law enforcement interview, Relator admitted knowing J.V. but denied receipt of any funds from J.V., despite bank records of J.V. reflecting the transfer of $123,030.58 to Relator's Wells Fargo Bank account on October 22, 2007. In totality, this evidence shows more than a fair probability that Relator committed the crimes of swindling and forgery.

While Relator challenges the credibility of witnesses referenced in the prosecutor's affidavit, the Court finds the evidence regarding swindling and forgery to be generally consistent, corroborated in part and not indicative of lack of witness credibility. For example, bank account records confirmed that J.V. and O.V. sent their money to Relator in October 2007, and even the B.E. Investment receipt that Relator prepared for J.V. stated this. Similarly, while Relator questions how E.V. could have learned that his daughter worked at a school rather than as head of an investment firm, this fact was separately confirmed by Relator himself during briefing on the issue of detention. (*See* ECF No. 23 at 17.) Moreover, Relator challenges the basis of the evidence in paragraphs 5, 8 and 9 of the affidavit concerning a check from Relator to S.S.T. or K.T. dated October 30, 2007. This evidence was apparently included to show that Relator used the proceeds of his fraud to pay off another debt. Yet, as pointed out by the government, evidence of how Relator used the proceeds is not required to establish the crime of swindling. Once Relator obtained funds from J.V. and O.V. based on deceit, the crime was complete under Lithuanian law, and Relator's challenge to the evidence about what subsequently happened to the money does not alter the probable cause determination.

Finally, Relator argues that there is no evidence he knew B.E. Investment Group was a sham company when he dealt with J.V. and O.V., essentially arguing the government has failed to show that Relator intended to defraud the victims. The

Court disagrees.  Relator's fraudulent intent or deceit is evidenced in the prosecutor's affidavit by (i) Relator's false representations to J.V. and O.V. that their funds would be invested in a firm headed by his daughter, (ii) his attempt over several years to avoid providing a written receipt to J.V. and O.V. for their investment, (iii) his eventual creation of a fake receipt that included the name of a non-existent company "B.E. Investment Group," and (iv) his later denial of receiving funds from J.V.  Based on this evidence, there is ample basis to believe that Relator intended to defraud J.V. and O.V. from the beginning of his discussions with them about a possible investment and that he always knew the entity "B.E. Investment Group" did not exist.

In sum, the totality of evidence establishes probable cause that Relator is guilty of swindling by obtaining money from J.V. and O.V. after falsely telling them that he would invest their funds in an entity he knew was a sham and that Relator knowingly created, forwarded and used the forged B.E. Investment Group receipt in furtherance of his scheme to swindle funds from J.V. and O.V.

## B.  Violating Public Peace and Order

The crime of Violating Public Peace and Order under Lithuanian law requires proof that "a person who, by defiant conduct, threats, taunting or acts of vandalism, demonstrates disrespect to the surrounding people or the environment in a public place and thereby disrupts public peace or order."  (ECF No. 19 at 34.)  Here, Lithuania asserts that Relator verbally confronted and struck the victim D.V. in the face at a nightclub in Siauliai, Lithuania, on February 22, 2009.  Evidence has been presented from D.V., as well as witnesses from the nightclub (specifically, E.V., R.V., J.B., M.B., A.K. and L.V.).  Two specialist (expert) reports were also provided by Lithuania, both of which conclude that D.V. suffered a contusion and bruise on his left cheek, caused by a hit from a solid blunt object which could possibly have been a fist.  Although Relator has pointed to certain inconsistencies between the witnesses, D.V., E.V., and R.V. all stated that Relator hit D.V. at least twice in the face on the night in question.  (ECF No. 19 at 56-47, 83, 85-86, 89-90.)  D.V. and

E.V. also both reported that Relator shouted at D.V. and threatened to kill him. (ECF No. 19 at 56, 83, 85-86, 89-90.) The two specialists corroborated the nature of D.V.'s injuries. The Court finds that inconsistencies in other aspects of the witness statements are not sufficiently material to discredit their consistent evidence on the key issue of Relator striking D.V. at the nightclub.

Thus, having reviewed the evidence presented with the Government's request for extradition, the Court finds it sufficient to establish probable cause that Relator verbally assaulted D.V., struck D.V. in the face, and thereby committed the offense of violating public peace and order.[2] As discussed above, Relator is not extraditable to Lithuania on this offense alone, but because Relator is extraditable for swindling or forgery, he may also be extradited under the Treaty for violating public peace and order.

## VI. HUMANITARIAN CONCERNS

In his opposition brief, Relator presented evidence about inhumane conditions in Lithuanian prisons and the hardships he would face if incarcerated there, particularly given his advanced age and his physical and mental infirmities:

> Recently, the Council of Europe, through the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment ("CPT"), reported disturbing treatment and conditions at Lithuanian prisons. *See* COUNCIL OF EUROPE, Report to the Lithuanian Gov't (June 25, 2019), https://www.coe.int/en/web /cpt/-/the-cpt-publishes-a-report-on-lithuania (attached here at Ex. A [ECF No. 55-2]). In 2019, The CPT reported its "regret[] to note that many of" its previous recommendations concerning the Lithuanian prison system had "still not been implemented." (*See* Ex. A at p. 3.) This

---

[2]   The Court has considered notations in the record regarding what were apparently adverse preliminary rulings or orders by Lithuanian courts in connection with this charge against Relator. Because the current charge is authorized by a Lithuanian court and has been presented in compliance with the Treaty, the Court concludes that earlier rulings by the Lithuanian court do not preclude a finding that – based on the evidence submitted with the extradition request – probable cause exists regarding the offense of violating peace and public order.

included the amount of space per prisoner, excessive force, "truly extraordinary levels *of inter-prisoner violence*, intimidation and exploitation" in particular prisons, and ineffective investigation into "numerous allegations of *mass physical ill-treatment of prisoners*." (*Id.*) (emphasis in original).

For example, "[t]he delegation was again inundated with allegations of prisoners having been subjected to violence (including violence of a sexual character and forcing fellow prisoners to perform slave labour) from the members of informal prisoner hierarchies," whose power was "facilitated by a very low prison staff presence (as well as, at least to a certain degree staff collusion and corruption)." (*Id.* at 13) (emphasis and footnotes omitted). Prisoners who sought protection "had to spend months (usually 6 months) if not years in small and often dilapidated cells . . . *de facto* amounting to solitary confinement for those prisoners who were accommodated alone." (*Id.* at 14.) In other words, "prisoners asking for protection received instead isolation and punishment." (*Id.*) In fact, "some inmates were— according to their own words—so desperate to be taken away from the main accommodation [in these prisons] that they were prepared to kill a fellow inmate, only to be able to obtain the much sought-after disciplinary segregation measure and thus feel safer than in their ordinary unit." (*Id.*)

The CPT further related how, "[t]o make the dismal picture complete, many prisoners told the delegation that they had sought placement in KTP [i.e., the punishment blocks] because of the perceived threat of being forced to become drug addicts and out of fear of contracting HIV and hepatitis C." (*Id.*) The CPT concluded "[t]his situation is clearly totally unacceptable." (*Id.*) [ECF No. 55 at 24-25.]

In light of those conditions in Lithuanian prisons, Relator urges that humanitarian considerations weigh heavily against extradition in his case:

Exposing anyone to such conditions [in Lithuanian prisons] is "so antipathetic" to our nation's "sense of decency" that they warrant applying an exception to the non-inquiry principle. . . . Here, though, Mr. Sassounian would be especially vulnerable to these "totally unacceptable" conditions. He is 77 years old, diabetic, and generally

physically frail. In his state, he would be a target to the rampant violence and corruption plaguing Lithuanian prisons. Moreover, according to the attached report of psychologist Dr. Stacey Wood, he "suffers from Mild Cognitive Impairment ('MCI') in the area of memory and new learning." (Ex. B, Dr. Stacey Wood Report at p. 6.) Dr. Wood explains that "MCI is considered to be a stage between normal aging and dementia where an individual retains functional abilities but have at least one cognitive domain that is significantly lower than expected." (*Id.*) "Most but not all individuals with an MCI diagnosis will eventually decline, as MCI increases the risk of a dementia diagnosis in the future (3 - 6 years)." (*Id.*) Meanwhile, Mr. Sassounian also appears to suffer from Major Depressive Disorder. (*Id.*) Dr. Wood notes how "[t]he emergence of depression in later life is itself a risk factor for developing a dementia syndrome from all causes." (*Id.*)

There is every reason to believe that Mr. Sassounian's conditions would deteriorate while subjected to the inhumane conditions reported in Lithuanian prisons. Exacerbating the risks of such deterioration is the dearth of adequate health care at the prisons. In 2019, the CPT reported how, in one of Lithuania's prisons, there had been a vacancy for the psychiatrist position for 15 years until March 2018. (Ex. A at p. 22.) Even then, the new psychiatrist was only a part-time "retired person who lives some 80 km from the prison." (*Id.*) In these conditions, Mr. Sassounian would suffer disproportionately more compared to others without his mental health issues. [ECF No. 55 at 25-26.]

This evidence from Relator raises serious questions about the surrender of an elderly and increasingly infirm man to a country whose prisons are reported to fall well below minimum humanitarian standards – so that he may stand trial on charges concerning an alleged financial crime and two punches thrown in a bar from more than ten years ago.

The government responds that humanitarian issues are not relevant now because the Court lacks authority to deny an extradition certification due to foreign prison conditions; instead, the United States Secretary of State has "sole discretion

. . . to refuse extradition on humanitarian grounds . . . ." *Quinn v. Robinson*, 783 F.2d 776, 789-90 (9th Cir. 1986). This principle of "non-inquiry" derives from the fact that it is the Executive Branch that ensures the United States upholds its obligations under extradition treaties and evaluates claims of possible mistreatment by a foreign state. "It is not that questions about what awaits the [relator] in the requesting a country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." *United States v. Lui Kin-Hong*, 110 F.3d 103, 111 (1st Cir. 1997). To counter this position, Relator cites dicta from *Emami v. U.S. Dist. Court for N. Dist. of California*, 834 F.2d 1444, 1453 (9th Cir. 1987), for the proposition that factual considerations might someday warrant development of an exception to the "non-inquiry" principle. However, Relator also concedes that no federal court decision has yet denied extradition based on humanitarian concerns, and the "non-inquiry" principle remains controlling. (ECF No. 55 at 19.) Thus, the Court concludes that the humanitarian concerns raised by Relator – albeit significant − are beyond the scope of the present proceedings and instead need be raised before the Secretary of State when surrender of Relator to Lithuania is considered.

## VII. CONCLUSION

Because the government has presented competent evidence establishing probable cause that Relator is guilty of the offenses of swindling, forgery, and violating public peace and order and because the other requirements for extradition have been met, the Court grants the government's request for a certification that Manuel Dikran Sassounian is subject to extradition under 18 U.S.C. § 3184 and the Treaty.

Nevertheless, the Court believes that the circumstances of this case – namely Relator's deteriorating physical and mental health, the reported conditions in Lithuanian prisons, and the nature and timing of the charged offenses – present

serious humanitarian concerns and warrant careful consideration by the Secretary of State in deciding whether Relator should be surrendered to Lithuania.

IT IS SO ORDERED.

DATED:  3/9/2020

_____
ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE